**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IYHANA BYRD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-778 |
| | § | |
| CITY OF HOUSTON, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM & OPINION**

In this wrongful-termination case, Iyhana Byrd sued her former employer, the City of Houston, for firing her after she took leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* (Docket Entry No. 1). Byrd alleges that the City interfered with, and retaliated against her for exercising, her FMLA rights. She alleges that by authorizing her request to take FMLA leave and then finding after the fact that she was ineligible to do so; failing to process and uphold her FMLA request; and terminating her for taking her FMLA leave, the City violated the Act. (*Id.* at ¶ 12). Byrd has moved for partial summary judgment on liability and liquidated damages, and the City has moved for summary judgment on all issues. (Docket Entry Nos. 14–16).

Based on the parties' pleadings, briefs, the record, the applicable law, and the oral arguments counsel presented at a hearing, the court denies both motions. The reasons are detailed below.

## I. Background

### A. Byrd's Work and FMLA Leave

Byrd began working for the City as a Houston Emergency Center 9-1-1 telecommunicator on May 8, 2017. (Docket Entry No. 13 at ¶ 1). Byrd confirmed receiving the Center's Policies and Procedures Overview Manual that day. (*Id.* at ¶ 24). On February 1, 2018, Byrd was still a

probationary employee because she had worked for the City for less than a year.  (Docket Entry No.

13 at ¶¶ 2, 23).

The Center's Attendance and Punctuality Policy included rules on employee absences.  The

Policy defines "scheduled time" or a "scheduled occurrence" as:

> [a]n approved absence from the employee's scheduled work shift where the request
> for that absence was made more than 24 hours in advance of the absence date. This
> includes scheduled: vacation, accrued holiday, accrued compensatory time, and in
> some instances, sick leave (e.g., an employee knows well in advance that he/she will
> have surgery and will use sick leave for time missed).

(*Id.* at ¶ 19).  The Policy defines "unscheduled time" or an "unscheduled occurrence" as:

> [a]ny absence from or during an employee's scheduled work shift designated as an
> "emergency" or sick event, or any absence where the request for that absence was
> made less than 24 hours in advance of the absence date. This includes unscheduled
> sick leave, emergency vacation, emergency compensatory time, and emergency
> accrued holiday time.

(*Id.*).  The Policy prohibits employees from "schedul[ing] themselves for time off if it exceeds the

number of hours available in their time bank," with an exception "in the case of FMLA [leave] or

an approved leave of absence."  (*Id.*).  The Policy explains that "[a]ny absence designated as leave

covered by the [FMLA] cannot be considered when applying this policy."  (*Id.*).  Probationary

employees with over 40 hours of unscheduled time may be terminated, but they "will receive written

counseling from his/her supervisor" when they reach that 40-hour limit.  (*Id.* at ¶ 11; Docket Entry

no. 13-1 at 32).  The Center's Overview Manual included the City's attendance and FMLA policies.

The Center's Employee Performance Reports purport to show Byrd's unscheduled time from

August to November 2017.  (Docket Entry No. 13 at ¶¶ 13–16).  The August 2017 Report

documents 1 minute of unscheduled time for the month and 28 minutes for the year.  (*Id.* at ¶ 13).

In September, Byrd had 5 minutes of unscheduled time for the month and 33 minutes for the year.

(*Id.* at ¶ 14). In October, she had 7 hours and 27 minutes of unscheduled time for the month and 8 hours for the year. (*Id.* at ¶ 15). In November, she had 8 hours of unscheduled time for the month and 16 hours for the year. (*Id.* at ¶ 16). Byrd's timesheets show that she took approximately 40 hours of sick leave, 24 hours of vacation sick time, and 8 hours of unscheduled vacation time in November 2017, but the timesheets do not specify whether the sick time was classified as scheduled or unscheduled. (Docket Entry No. 13-1 at 39–40).

After Byrd's daughter was hospitalized, Byrd asked the City for FMLA leave starting on February 1, 2018. Byrd sent an email asking Shirley Blackshear, the Center's FMLA Coordinator, to send her an FMLA packet that day. (Docket Entry No. 13 at ¶¶ 4, 26). On February 6, Blackshear signed Byrd's FMLA packet. (*Id.* at ¶¶ 5). On February 9, Blackshear signed a Notice of Eligibility and Rights & Responsibilities for Byrd, checking the box to state that Byrd was eligible for FMLA leave. (*Id.* at ¶ 7).

Byrd took FMLA leave from February 1 to February 11, 2018. (Docket Entry No. 1 at ¶ 7). She returned to work on February 12. (*Id.*). The next day, February 13, before Byrd had returned the doctor-completed Certification of Healthcare Provider form that was not due until February 21, Blackshear signed an FMLA Disapproval Notification stating that because Byrd had not worked 1,250 hours or one year with the City, she was in fact ineligible for the FMLA leave she had been approved to take and had taken. (Docket Entry No. 13 at ¶ 9). Blackshear emailed Byrd the disapproval notice, which stated that the "KRONOS system was in error." (*Id.* at ¶¶ 9, 28). The KRONOS system is the software system the City used to determine FMLA eligibility. (*See id.*). Byrd responded to that email, explaining that because the certification from the doctor was not due until February 21, "[n]o one has received my doctor's information to approve or deny my FMLA

request." (*Id.* at ¶ 29). Byrd had the Certification of Healthcare Provider form signed and completed by her doctor on February 20. (*Id.* at ¶ 8). The medical basis for FMLA leave is not disputed.

Byrd was terminated on February 22. (*Id.* at ¶ 10). The Center's Director, David Cutler, approved a termination letter stating that Byrd had 88 hours of unscheduled absences. (*Id.*). Cutler manages the Center and its employees, with "full authority to terminate the employment of a probationary employee" he believes is "unable or unwilling to render satisfactory service, or for other sufficient cause." (Docket Entry No. 16-2 at 1). Byrd received no probationary counseling for excessive unscheduled absences before her termination. (Docket Entry No. 13 at ¶ 12).

### B.     Byrd's Claims and the Cross-Motions for Summary Judgment

Byrd argues that her absences from February 1 to February 11, 2018 were protected leave under the FMLA. (Docket Entry No. 1 at ¶¶ 7, 12). While she concedes that she was ineligible for FMLA leave because she had not worked for the City for more than one year, she argues that the City's representation to her of her eligibility, and her reliance on it, estops the City from denying her eligibility after the fact. (*Id.* at ¶ 8). She asserts FMLA interference and retaliation claims, alleging that the City "failed to properly process her under the FMLA" and then terminated her for taking FMLA-protected leave. (*Id.* at ¶ 12). Byrd moves for partial summary judgment as to liability and liquidated damages. (Docket Entry No. 14).

The City cross-moves for summary judgment, arguing that there is no genuine dispute of material fact establishing that Byrd was not an eligible employee under the FMLA and that Byrd has not rebutted the City's explanation for her termination—for excessive unscheduled absences—as unrelated to FMLA leave. (Docket Entry No. 16 at 14). The City argues that Byrd was in fact

ineligible for FMLA leave because she did not meet the 1-year and 1,250-hour requirements for eligibility for FMLA leave. (*Id.*). The City admits that it gave Byrd incorrect information that she was eligible, and that it did not retract or correct the information until after Byrd had taken her FMLA leave and returned. (*Id.*; *see* Docket Entry No. 13 at ¶¶ 9–10). But the City argues that Byrd's reliance on Blackshear's representation of eligibility before taking the FMLA leave was unreasonable, because the City's written Policy, contained in the Center's Overview Manual that Byrd received when she began work, stated the FMLA requirements. (Docket Entry No. 16 at 7). The City also responds to Byrd's motion for partial summary judgment, arguing that because there is a "factual dispute regarding the city's subjective good faith related to her liquidated damages claim," summary judgment on that issue, even assuming the City is liable, is improper. (*Id.* at 19).

## II.     The Relevant Legal Standards

### A.        Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the moving party must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp., Inc.*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). The court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## B. The Family and Medical Leave Act

The FMLA allows qualified employees working for covered employers to take up to 12 weeks of unpaid leave during a 12-month period, for an employee's serious health condition or to take care of family members. *See* 29 U.S.C. § 2612(a); *Willis v. Coca Cola Enter., Inc.*, 445 F.3d 413, 417 (5th Cir. 2006). The FMLA prohibits employer interference with leave and retaliation for taking leave. *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 681 (5th Cir. 2013). An "eligible employee" is "an employee who has been employed — (i) for at least 12 months by the employer . . . and (iii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

## III. Analysis

### A. The Summary Judgment Evidence

The parties provide an appendix of undisputed facts.[1] (Docket Entry No. 13-1). Byrd[2] and the City[3] each offer additional summary judgment evidence. (Docket Entry Nos. 14-1, 16-1–16-4).

---

[1] The appendix includes: (1) Byrd's hiring form; (2) a termination letter approved by Cutler dated February 22, 2018; (3) Byrd's resignation form; (4) Byrd's acknowledgment of receiving the City's Electronic Timekeeping Policy for Non-Exempt Employees; (5) Byrd's employee performance reviews for August, September, October, and November 2017; (6) a memo showing that Byrd received certain FMLA documents on February 6, 2018; (7) a Notice of Eligibility and Rights and Responsibilities from Blackshear; (8) emails from Byrd to Blackshear; (9) Blackshear's denial of Byrd's FMLA request on February 13, 2018; (10) Byrd's Certification of Health Care Provider; (11) Byrd's form requesting FMLA leave dated February 9, 2018; (12) the Center's Attendance and Punctuality Policy; (13) Byrd's timesheets from May 6, 2017 to March 9, 2018; and (14) a form showing Byrd's receipt of the Center's Overview Manual. (Docket Entry No. 13-1).

[2] Byrd's evidence includes: (1) Byrd's declaration; (2) a declaration from Brittany Riley, a former City employee; and (3) an affidavit from Blackshear. (Docket Entry Nos. 14-1).

[3] The City's evidence includes: (1) an affidavit from David F. Cutler; (2) Houston Code of Ordinances § 14-125; (3) a memorandum from India Summers, the Center's Night Shift Operations Manager; and (4) Houston Code of Ordinances § 14-170. (Docket Entry Nos. 16-1–16-4).

The City objects to Byrd's proffered amended declaration of Brittany Riley. (Docket Entry No. 16 at 13). The City argues that the declaration is not relevant and that "[n]one of the statements contained in the Riley declaration supports or provides admissible and competent summary judgment evidence to support any of Byrd's claims." (Docket Entry No. 16 at 13). The City does not specify the parts of the declaration that are objectionable or why, beyond the conclusory statement that the declaration "bears no relationship to any factual matters or genuine disputes involved in the case at bar." (*Id.*).

Byrd argues that Riley's declaration is relevant, noting that the attached pay statements show that Riley, another Center employee working at the same time as Byrd, began accruing sick leave before she had worked for the City for six months. (Docket Entry No. 17 at 5). Byrd also argues that the declaration is relevant because Riley "was wrongfully fired for taking retroactively disapproved FMLA leave contemporaneously with Ms. Byrd." (*Id.*).

Federal Rule of Evidence 401 defines "relevant evidence" as evidence having "any tendency to make a fact more or less probable than it would be without the evidence" if "the fact is of consequence in determining the action." FED. R. EVID. 401. "Irrelevant evidence is not admissible." FED. R. EVID. 402.

The declaration describes Riley's request for FMLA leave while working as a probationary employee in the Houston Emergency Center and her termination after returning from that leave. (Docket Entry No. 14-1 at 10). Like Byrd, Riley asked Blackshear for leave, had the request approved, and took the approved leave in early 2018. (*Id.* at 10–11). Included in the declaration are Riley's eligibility notice and FMLA approval from Blackshear, the after-the-fact denial of her leave

approval after she returned to work from her leave, her termination letter, her attorney's letter to Cutler, and her pay statements from June 2009 to February 2018. (*Id.* at 14–22, 16–18, 24–59).

To the extent that Byrd uses Riley's declaration to show how a similarly situated employee accrued vacation and sick leave hours, the declaration is relevant. The parties dispute whether Byrd could accrue similar hours as scheduled time while she was a probationary employee. Byrd asserts that the November 2017 absences the City alleges were the basis of her February 2018 termination were for scheduled sick time that she was permitted to take under the Center's policy. (Docket Entry No. 16 at 16; Docket Entry No. 17 at 2–3). However, to the extent that Byrd attempts to use the Riley declaration to show that Riley was terminated for taking FMLA leave, the declaration is not clearly relevant. The declaration provides Riley's explanation of the events surrounding her termination, but that is relevant only to the extent it shows that another similarly situated employee was terminated after a similar experience of approved leave disallowed after the fact. The declaration does not, however, show whether the City terminated Byrd because of her FMLA leave or because of excessive, earlier unscheduled absences. The declaration and attached pay stubs are considered only to the extent they are relevant.

Byrd objects to the City's proffered memorandum from India Summers, which lists the "dates that were used as the basis for probationary termination." (Docket Entry No. 17 at 3–4). Byrd points out that the Summers memorandum is "unsworn" and states that the dates are correct only "to the best of [Summers's] knowledge." (*Id.*). Byrd argues that the memorandum is hearsay because "'to the best of my knowledge' is insufficient to establish personal knowledge" and the memorandum was generated during this litigation. (*Id.* at 4). The City explains that the Summers memorandum was generated during, but not for, the litigation, "was provided to Byrd during

exchange of initial disclosures," and is "no more than [the Center's] memorialization of Byrd's unscheduled occurrences/tard[ies] during 2017." (Docket Entry No. 19 at 2 n.1).

Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a); *see also In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (quoting FED. R. EVID. 901(a)). "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (internal citation and quotation marks omitted). "Rule 901 is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *Id.* (citation omitted).

The challenged statements in the Summers memorandum describe what Summers, the night-shift operations manager for the Center, understood as the basis for Byrd's termination. (Docket Entry No. 16-4). Summers states that she "administered" Byrd's termination letter. (*Id.*). Cutler's affidavit explains that "Summers documented, in the course of the department's business and for [Center] records," Byrd's absences and tardies "between July 27, 2017 through November 28, 2017." (Docket Entry No. 16-2 at 2). Cutler states that "[t]hese [absences] were the unscheduled occurrences I reviewed and considered in my employment decision." (*Id.*). But Summers did not prepare the memorandum until August 31, 2018, well after Cutler's February 22, 2018 termination decision. (*See* Docket Entry No. 19 at 2; Docket Entry No. 16-2). The Cutler affidavit is sufficient to authenticate the Summers memorandum, but not enough to make the memorandum admissible.

"Under Federal Rule of Evidence 801(c), hearsay is a statement, other than one made by the declarant while testifying at trial or a hearing, offered in evidence to prove the truth of the matter asserted." *United States v. St. Junius*, 739 F.3d 193, 202 (5th Cir. 2013) (citing FED. R. EVID. 801(c)). Hearsay evidence is generally inadmissible, but the rule "does not apply when an out-of-court statement is offered for some purpose other than to prove the truth of the matter asserted." *Id.*; FED. R. EVID. 802. To the extent that the memorandum is offered to show the information that Cutler based his termination decision on, the memorandum is not offered to prove the truth of its contents and is not hearsay.

However, the City cannot use the Summers memorandum to prove that the hours Summers reported as Byrd's unscheduled absences were accurately recorded or classified. Cutler's affidavit suggests that the Summers memorandum falls under Federal Rule of Evidence 803(6), as a record of regularly conducted activity. To fall under this rule, the record must be made "at or near the time" of the act based on information from or by someone with knowledge, must be "kept in the course of a regularly conducted activity of a business," and "making the record [must be] a regular practice of that activity." FED. R. EVID. 803(6)(A)–(C). To be admissible, the custodian or a qualified witness must testify that the record meets all these criteria, and that neither "the source of information [n]or the method or circumstances of preparation indicate a lack of trustworthiness." FED. R. EVID. 803(6)(D)–(E). Cutler states that Summers recorded the dates and absences for the Center's records, while Byrd argues that "the document was generated during litigation," showing at least that it was not made at or near the time of the act. (Docket Entry Nos. 16-2, 17).

The Summers memorandum is dated August 18, 2018, six months after Byrd's termination. The parties have filed contemporaneous records of Byrd's attendance, including the City's

timesheets and monthly performance reports for Byrd. (*See* Docket Entry No. 13-1). The Summers memorandum, in contrast, was prepared months after Byrd had sued the City. Cutler's statement that Summers wrote the memorandum "in the course of the department's business and for [the Center's] records," as opposed to for litigation, is conclusory and does not show that the Rule 803(6) exception applies. (Docket Entry No. 16-2 at 2). To the extent that the City attempts to use the Summers memorandum as evidence of the number of hours Byrd actually took for unscheduled absences or how they were properly classified, the memorandum is not admitted.

### B.        Timeline of Byrd's Employment

Essential to determining whether the City is estopped from denying Byrd's eligibility for FMLA leave and to analyzing Byrd's claims under the FMLA is establishing which of Byrd's absences were unscheduled absences that the City could take into account in deciding to terminate her. The following timeline provides the key dates on which Byrd and the City rest their arguments.

| | |
|---|---|
| May 8, 2017 | Byrd starts work at the Houston Emergency Center. |
| November 8, 2017 | Byrd completes 6 months at the Houston Emergency Center. (*See* Docket Entry No. 18 at 3). The Riley declaration shows that Riley received 42.54 vacation hours after working for the Center for 6 months, and Byrd argues she would and should have received similar time. (*See id.*; Docket Entry No. 14-1 at 50). |
| November 11, 14–17, 2017 | Byrd's timesheets show that she was absent (8 hours) and took compensable sick leave each of these days. (Docket Entry No. 13-1 at 39). The Summers memorandum states that Byrd missed 8 hours each day and treated the time as an unscheduled absence. (Docket Entry No. 16-4). |
| November 18, 2017 | Byrd's timesheets show that she was absent (8 hours) and took unscheduled vacation time. (Docket Entry No. 13-1 at 39). The Summers memorandum states that Byrd missed 8 hours and treated the time as an unscheduled absence. (Docket Entry No. 16-4). |

| | |
|---|---|
| November 21–22, 2017 | Byrd's timesheets show that she was absent from work (8 hours) and took vacation sick leave each of these days. (Docket Entry No. 13-1 at 39). The Summers memorandum states that Byrd missed 8 hours each day and treated the time as unscheduled absences. (Docket Entry No. 16-4). |
| November 23, 2017 | Byrd's timesheets list this date as Thanksgiving Day. (Docket Entry No. 13-1 at 40). The Summers memorandum states that Byrd missed 8 hours and treated the time as an unscheduled absence. (Docket Entry No. 16-4). |
| November 24, 2017 | Byrd's timesheets list this date as the "Day After Thanksgiving." (Docket Entry No. 13-1 at 40). The Summers memorandum states that Byrd missed 8 hours and treated the time as an unscheduled absence. (Docket Entry No. 16-4). |
| November 25, 2017 | Byrd's timesheets show that she was absent (8 hours) and took vacation sick leave. (Docket Entry No. 13-1 at 40). The Summers memorandum states that Byrd missed 8 hours and treated the time as an unscheduled absence. (Docket Entry No. 16-4). |
| November 28, 2017 | Byrd's timesheets show that Byrd was present. (Docket Entry No. 13-1 at 40). The Summers memorandum states that Byrd missed 1 hour and treated the time as an unscheduled absence. (Docket Entry No. 16-4). |
| December 5, 2017 | Byrd receives her November Employee Performance Review showing 8 hours of unscheduled time for November and 16 hours for the year. (Docket Entry No. 13-1 at 8). |
| February 1, 2018 | Byrd requests an FMLA packet and is absent from work. (Docket Entry No. 13-1 at 15). Byrd asserts that this was the first day of her FMLA leave. (Docket Entry No. 1 at ¶ 7). Byrd's timesheets show that she was absent (8 hours) and took compensable sick leave. (Docket Entry No. 13-1 at 41). The City argues it did not consider this absence in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). |
| February 2–3, 2018 | Byrd's timesheets show that she was absent (8 hours) and took vacation sick leave each day. (Docket Entry No. 13-1 at 41). The City argues it did not consider this absence in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). |

| | |
|---|---|
| February 4, 2018 | Byrd's timesheets show that she was absent (8 hours) and took compensable sick leave and vacation sick leave. (Docket Entry No. 13-1 at 41). The City argues that it did not consider this absence in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). |
| February 5, 2018 | Byrd's timesheets show that she was absent (8 hours), listing her as "AWOL" and as taking unscheduled vacation time. (Docket Entry No. 13-1 at 41). The City argues that it did not consider this absence in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). |
| February 6, 2018 | Byrd receives the FMLA packet from Blackshear. (Docket Entry No. 13-1 at 12, 16). |
| February 8, 2018 | Byrd's timesheets show that she was absent (8 hours), listing her as "AWOL." (Docket Entry No. 13-1 at 42). The City argues it did not consider this absence in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). |
| February 9, 2018 | Byrd's timesheets show that she was absent (8 hours), listing her as "AWOL." (Docket Entry No. 13-1 at 42). The City argues it did not consider this absence in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). Blackshear informed Byrd that she was eligible for FMLA leave. (Docket Entry No. 13-1 at 13). |
| February 10–11, 2018 | Byrd's timesheets show that she was absent (8 hours), listing her as "AWOL" for each day. (*Id.* at 42). The City argues it did not consider these absences in deciding to terminate her employment. (Docket Entry No. 15-2 at 2). |
| February 12, 2018 | Byrd returns to work. (*See* Docket Entry No. 1 at ¶ 7). |
| February 13, 2018 | Byrd is informed that her FMLA request is denied. (Docket Entry No. 13-1 at 17–18). Byrd fills out the Date of Request/Notice of FMLA form. (*Id.* at 23). |
| February 20, 2018 | Byrd has a doctor complete the FMLA healthcare provider form. (*Id.* at 20–22). |
| February 22, 2018 | Byrd is terminated. (*See* Docket Entry No. 13-1 at 4–6). |

### C. Byrd's Estoppel Claim

Byrd concedes that she was not an eligible employee when she requested FMLA leave because she had not worked for the City for a full year. (Docket Entry No. 14 at 5). However, she argues that the City is estopped from asserting an ineligibility defense because the City represented to her that she was eligible, had reason to know that she would rely on that representation, and she reasonably relied on that representation, to her detriment. (*Id.*).

In *Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352 (5th Cir. 2006), the plaintiff, Melissa Minard, requested FMLA leave for surgery. Her employer granted her request, stating that she was an "eligible employee" under the Act. *Id.* at 354. After Minard took her leave, her employer discovered that she was not eligible "because when she requested leave [the employer] employed less than 50 employees at or within 75 miles of [her] worksite." *Id.* The district court granted summary judgment to the employer, but the Fifth Circuit reversed. *Id.* at 358. The appellate court explained that equitable estoppel could operate to preclude an employer from asserting an eligibility defense against an employee to whom the employer had made representations of FMLA leave eligibility. *Id.* The court stated:

> an employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an "eligible employee" and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of non-coverage, if the employee reasonably relies on that representation and takes action thereon to her detriment.

*Id.* at 359. The court concluded that there was a factual dispute material to deciding whether Minard had shown that equitable estoppel applied. *Id.* While the employer "unintentionally made a definite misrepresentation to Ms. Minard that she was an 'eligible employee' under [the] FMLA at the time she requested leave," and Minard had "reasonably relied upon that misrepresentation," the question of whether she had relied on the misrepresentation to her detriment remained. *Id.*

Byrd argues that the facts meet each of *Minard*'s elements. (Docket Entry No. 14 at 10). First, the City represented that she was eligible to take FMLA leave "both orally and in writing." (*Id.*). Second, the City knew she needed the FMLA leave to care for her daughter, establishing a clear reason to believe that she would rely on that representation. (*Id.*). Third, she relied to her detriment on the representation because she took the leave, but "[i]f she had known that she would lose her job, she would have worked with her family to find alternative arrangements." (*Id.* at 10–11). The third element is disputed.

Byrd argues that the City's issuance of the Notice of Eligibility on February 6 supports her estoppel claim. She points out that the FMLA requires an employer to inform an employee it believes to be taking leave "for an FMLA-qualifying reason" to "notify the employee of the employee's eligibility" for that leave within five business days. (*Id.* at 11 (quoting 29 C.F.R. § 825.300(b)(1))). Byrd argues that the February 6 Notice was the required notification of her FMLA eligibility. (*Id.*). Byrd contends that retroactive designations of ineligibility are permitted "only if the change 'does not cause harm or injury to the employee.'" (*Id.* (quoting 29 C.F.R. § 825.301(d))).

The City argues that estoppel does not apply because Byrd was provided with the Center's Policies and Procedures Overview Manual and the City's FMLA Policy. (Docket Entry No. 16 at 7). The City explains that the City's Policy provides the eligibility requirements for FMLA leave. (*Id.*). There is no Center-specific FMLA leave approach different from the City's in the Center's Overview.

Byrd's summary judgment evidence supports her assertion that she has met most of *Minard*'s requirements. First, the City made a representation that Byrd was an eligible employee. (*See* Docket Entry No. 13-1 at 13). Cases citing *Minard* in the Fifth Circuit have primarily examined an

employer's misrepresentations about employee eligibility in relation to the threshold number of employees at a worksite. *See, e.g.*, *Allen v. MidSouth Bank*, No. H-12-1618, 2013 WL 708029, at \*\*4–7 (S.D. Tex. Feb. 25, 2013); *McFadden v. Seagoville State Bank*, No. 3:08-CV-0467-B, 2009 WL 37596, at \*6 (N.D. Tex. Jan. 6, 2009). Cases outside the Fifth Circuit cited with approval in *Minard* suggest that equitable estoppel also applies to representations made in relation to the 1-year eligibility threshold. *See, e.g.*, *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 724–27 (2d Cir. 2001). *Gurley v. Ameriwood Indus., Inc.*, 232 F. Supp. 2d 969, 973–74 (E.D. Mo. 2002) is instructive. Catherine Gurley was informed that she was eligible for FMLA leave on January 6, 1999, but she had not worked for the company for 1 year until January 12, 1999. *Id.* at 973. Gurley was terminated and sued. The district court denied the employer's motion for summary judgment, finding that there were factual disputes material to deciding if equitable estoppel applied. The employer had informed Gurley that she was eligible for FMLA leave before the end of her first year, which was sufficient evidence to show that equitable estoppel might apply. *Id.* at 974.

The joint statement shows that Byrd made a request for FMLA leave—through email and the City's official FMLA form—and the City, through FMLA Coordinator Shirley Blackshear, stated that Byrd was eligible. (Docket Entry No. 13-1 at 13). The City has not disputed these facts. Byrd has provided sufficient evidence that her employer made a definite statement misrepresenting her eligibility for FMLA leave.

Byrd also provides sufficient evidence that she relied on Blackshear's representation, but there is a factual dispute as to whether she relied on that representation to her detriment. In *Minard*, the Fifth Circuit held that a plaintiff must show detrimental reliance on the employer's misrepresentation, but it concluded that a genuine dispute of material fact existed as to whether Minard had done so. *Minard,* 447 F.3d at 397. Minard's employer argued "that she would have

been forced to undergo her surgery at that time regardless" of whether she was granted leave, and Minard asserted "that there were other medical alternatives available to her . . . and that she would have followed such an alternate course if [her employer] had correctly informed her that she was" ineligible for FMLA leave. *Id.* Minard's employer did not dispute that she was terminated for her absences related to the surgery.

Byrd argues that she "relied on the assurances of the City that she qualified for leave," in that she would not have taken leave if she had known that she was ineligible and would be fired if she did so. (Docket Entry No. 14 at 8). She explains that "she had family members who could have covered for her at the hospital while she went to work." (*Id.*). The City has not challenged that Byrd relied on Blackshear's representation of her eligibility. However, the City does dispute that Byrd's termination was related to her FMLA leave in February 2018 to care for her daughter. (Docket Entry No. 16 at 7). The City argues that the recorded absences for the FMLA leave were not taken into account when the February 2018 termination decision was made. (*Id.*). There is a clear factual dispute about the causal connection between the February 2018 absences and Byrd's termination, material to determining that Byrd's reliance on Blackshear's material representation of her eligibility was to her detriment.

There is also a genuine factual dispute material to determining whether Byrd reasonably relied on the City's representation. Byrd argues that she "knew nothing about the legal requirements for FMLA leave, but she had no reason to question the assurance from the 'FMLA Coordinator' that she qualified for FMLA leave." (Docket Entry No. 14 at 7). The City suggests that it was unreasonable for Byrd to rely on Blackshear's representation because when Byrd began working, she received the Center's Policies and Procedures Overview Manual, which included the City's FMLA policy. (Docket Entry No. 16 at 7; Docket Entry No. 13-1 at 52). The FMLA policy clearly

states that only employees who have worked for the City for one year are eligible for FMLA leave. (Docket Entry No. 16 at 7). Byrd responds that the City offers no proof that she "actually read those policies to determine her eligibility," and the City "does not deny that [she] was entitled to rely on a representation from the City's own FMLA Coordinator." (Docket Entry No. 17 at 1). Neither side presents case law explaining when it is reasonable for an employee to rely on the representations of an FMLA coordinator (or similarly situated employee) over written policy statements previously provided to an employee. The parties dispute the reasonableness of Byrd's reliance on Blackshear's misrepresentations that Byrd was eligible for leave, as well as whether Byrd's reliance on that misrepresentation was to her detriment. These are genuine factual disputes material to deciding if equitable estoppel applies. Summary judgment is inappropriate on the issue of whether equitable estoppel applies to Byrd's claims.

### D. Byrd's Claims for FMLA Violations

An employer may not interfere with, restrain, deny, or retaliate based on the exercise of FMLA rights. *See* 29 U.S.C. § 2615(a)(1)–(2); *see also Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 681 (5th Cir. 2013). The elements of a plaintiff's *prima facie* interference claim are that: (1) the plaintiff was an eligible employee; (2) the employer was subject to the FMLA; (3) the plaintiff was entitled to leave; (4) the plaintiff gave the required notice that she was taking FMLA leave; and (5) the employer denied the benefits due under the FMLA. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017) (citing *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013)). The elements of a *prima facie* retaliation claim are that: "(1) [the employee] engaged in a protected activity; (2) the employer discharged her; and 3) that there is a causal link between the protected activity and the discharge." *Miedema v. Facility Concession Servs., Inc.*, 487 F. App'x 214, 218 (5th Cir. 2012). If these elements are shown, the employer then has the burden

to "articulate[] a legitimate non-discriminatory reason for the employment action at issue." *Caldwell*, 850 F.3d at 245 (citing *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016). If the employer meets this burden, the plaintiff must identify an issue of material fact showing that the stated reason was pretextual. *Id.* "In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 646 (5th Cir. 1985).

Byrd argues that she has made a *prima facie* showing of her FMLA interference claim. (Docket Entry No. 14 at 12). Neither party disputes that the City is "an employer subject to the FMLA's requirements." (*Id.*). Byrd argues that because the City is estopped from using FMLA ineligibility as defense, she is properly considered an eligible employee who was entitled to the FMLA leave she took and who gave proper notice of her intent to take that leave. (Docket Entry No. 14 at 12). Byrd alleges that the City interfered with her FMLA rights by "fail[ing] to properly process her under the FMLA" and "by then terminating her for taking leave that was protected under the FMLA." (Docket Entry No. 1 at ¶ 12).

The City argues that it had a "legitimate non-discriminatory reason" for terminating Byrd, unrelated to her FMLA leave. The City argues that Cutler's affidavit presents "[t]he City's articulated non-discriminatory reason and the only reason for its decision in terminating" Byrd. (Docket Entry No. 19 at 2). Cutler's affidavit and termination letter to Byrd explain that her "unsatisfactory attendance during the period of probation" was the basis for his decision. (*Id.*). Cutler's affidavit asserts that Byrd's 88 hours of unscheduled absences between July 2017 and November 2017—which the Summers memorandum documents as occurring almost exclusively in November 2017—was the only factor in his decision to terminate Byrd. Cutler's affidavit and the

termination letter "note[] that any [FMLA] time [in February 2018] was not taken into consideration in arriving at the employment decision." (Docket Entry No. 16-2 at 2; Docket Entry No. 19 at 1). The City explains that under City policy, any absence, including absences for sick leave and accrued vacation time, taken without 24-hour advance notice, is an unscheduled absence properly counted as such in a termination decision. (Docket Entry No. 13-1 at 30; Docket Entry No. 16 at 16). The City asserts that "[t]he termination letter's characterization of Byrd's time as 'unscheduled'" means that her absences "could only be . . . those absences [that] had not been given, minimally, within the 24-hour timeline provided under [the Policy], including any sick leave she sought to use." (Docket Entry No. 16 at 16 (emphasis omitted)).

Cutler explains that he relied on non-FMLA unscheduled absences in making his termination decision, absences that he asserts are documented in the August 2018 Summers memorandum. (Docket Entry No. 16-2 at 2). The Summers memorandum does not list any absences in February 2018. Instead, it shows only that Byrd was absent from work on November 11, 14–18, 21–25, and 28, 2017, due to illness, accruing 89 hours of absences. (Docket Entry No. 16-4). It also shows an additional sick day taken on October 7, 2017, contributing a further 7.45 hours to her hours missed. (*Id.*). While the memorandum is hearsay to the extent used to prove that the information as to Byrd's absences was accurate or accurately described as unscheduled, the memorandum provides some support for Cutler's argument that his termination decision was not based on Byrd's February 2018 FMLA leave, but he did not have the memorandum before making that decision.

Byrd's timesheets also appear to support at least some of the Summers memorandum's reporting of Byrd's sick leave. (*See* Docket Entry No. 13-1 at 35–51). The timesheets show that for November 11 and November 14–17, Byrd accrued 40 hours of sick leave. (Docket Entry No. 13-1 at 39). But the timesheets appear to show that Byrd's absence on November 18 was classified

as unscheduled vacation time; her absences on November 21, 22, and 25 were classified as vacation sick time, without indicating whether those were scheduled or unscheduled; her absences on November 23 and 24 were for Thanksgiving Day and the "Day After Thanksgiving," without indicating whether those were scheduled or unscheduled; and no absence was reported for November 28. (*Id.* at 39–40). Based on the Center's policy that "unscheduled sick leave" may count toward unscheduled absences, the Summers memorandum and the timesheets support the City's position insofar as Byrd had numerous absences in November. However, the timesheets do *not* document whether those sick days were scheduled or unscheduled, and the sick days the timesheets document suggest that even considering Byrd's unscheduled absences, they were well under 88 hours in that period. (*See* Docket Entry No. 13-1 at 39–40).

Byrd argues that the City has not shown undisputed facts that, as a matter of law, establish that her termination was for a reason unrelated to her FMLA absences. (Docket Entry No. 14 at 12). She argues that "the City set out to invent a justification for the termination" by asserting that "Byrd had multiple [unscheduled] absences in November 2017 and that those absences formed the basis for her termination in February 2018." (*Id.*). She asserts that "[w]ithout counting the FMLA time, the City's records show that [she] had only 16 hours of unscheduled time" before her termination. (Docket Entry No. 14 at 13).

Byrd presents evidence supporting an inference that the City's explanation of her termination is pretextual. Byrd explains that probationary employees accrue sick and vacation time during part of the probationary period, arguing that "[b]y November [8] 2017, [she] had worked for the City long enough to accrue sick time and vacation time" to take time off in November. (*Id.*). She asserts that her November 2017 absences were scheduled leave time because she used her accrued sick time to cover most of the absences from work, and the Center's policy states that vacation time and sick

22

time can be scheduled leave.  (*Id.*).  The City argues that Byrd had not accrued any vacation time by November 2017 because she was a probationary employee and City policy dictates that probationary employees do not accrue vacation time for six months.  But Byrd correctly points out that she would have been accruing sick leave even during her probationary period.  (Docket Entry No. 16 at 16; Docket Entry No. 14 at 13).  Because Byrd started on May 8, 2017, she could use, and she received, vacation time starting on November 8, 2017.  (Docket Entry No. 17 at 3).  She argues that her pay statements would show this as accrued vacation time, but the City has not produced these pay statements.  (*Id.*).  She points to Riley's pay statements as evidence that Byrd would have accrued vacation and sick time as well, making some of what the City says are unscheduled absences into scheduled time away. (*Id.*; Docket Entry No. 14-1 at 24–54).

Byrd's declaration explains that she discussed using vacation and sick time for her November 2017 absences with her supervisors, "and all of it (except for . . . one day) was approved and authorized." (Docket Entry No. 14-1 at 4). She does not allege when this approval happened.  Byrd offers her November 2017 Employee Performance Monthly Review that shows she had only 8 hours of unscheduled absences in November and 16 hours for the year to date.  (Docket Entry No. 14 at 13).  Byrd argues that her timesheets also show only 8 hours of unscheduled absences—the time marked as unscheduled vacation time—for November 2017, "which is below the City's 40-hour threshold for discipline for a probationary employee," and well below the 88 hours the City relies on.  (Docket Entry No. 17 at 2).  Byrd also suggests that if her termination was related to her November 2017 absences, she would have received the probationary counseling required under the Center's Policy before the termination.  (Docket Entry No. 14 at 9).  However, she never received any counseling.  (*Id.*).

While the City presented a legitimate, nondiscriminatory reason for firing Byrd, the arguments and record show that there are several genuine factual disputes material to determining whether the City's explanation is pretextual. The parties dispute whether the 88 hours of unscheduled absences that Cutler refers to in the termination letter are Byrd's actual unscheduled absences in 2017. Byrd's declaration and the November performance evaluation the City prepared state that the City counted many of those absences as scheduled absences. (*See* Docket Entry No. 13-1 at 30 ). Second, the City's timesheets for Byrd and Summers's August 2018 memorandum do not provide matching reports of Byrd's absences in November 2017. Again, the City's inconsistencies show genuine factual disputes about Byrd's absences, including whether the number of hours absent and whether they were scheduled or unscheduled. The timesheets do not show 88 hours of sick leave—whether scheduled or unscheduled—in November 2017. (*See* Docket Entry No. 13-1 at 24–54). Neither party has explained how Thanksgiving Day and the day after Thanksgiving were counted toward Byrd's absences. Nor have the parties explained whether the sick leave hours were treated as scheduled or unscheduled. Additionally, Byrd's Employee Performance Monthly Reviews, which the City contemporaneously prepared, report that her unscheduled absences in November 2017 were only 16 hours, which contradicts the Summers memorandum and suggests that the City counted Byrd's sick time in November as scheduled time and that the City told Byrd that these hours were treated as scheduled absences. (*See* Docket Entry No. 13-1 at 8). The City has not explained these discrepancies or inconsistencies.

The timing of Byrd's termination also undermines City's proffered justification for firing her. The Fifth Circuit has instructed district courts to "consider the 'temporal proximity' between the FMLA leave, and the termination" in evaluating the causal link in FMLA retaliation cases. *Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 583 (5th Cir. 2006). The City argues that Byrd was

24

terminated for the absences she accrued before the end of November 2017, but it did not terminate

her until February 2018.  (*See* Docket Entry No. 13).  The termination decision was ten days after

Byrd returned from the FMLA leave and nine days after the City informed Byrd that she was

ineligible for the leave she had taken.  It was almost three months after Byrd's November 2017

absences.  The temporal proximity connecting Byrd's leave, the City's retroactive denial of FMLA

leave eligibility, and her termination, raises factual disputes material to whether retaliation was the

reason for her termination.  *See Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 335 (5th Cir.

2005).

Pretext and causation are disputed.  Summary judgment cannot be granted to either party as

to liability.

### E.      Byrd's Claim for Liquidated Damages

Byrd seeks summary judgment that the City is liable for liquidated damages under the

FMLA.  (Docket Entry No. 14 at 14).  Under the FMLA, an employee may receive "an additional

amount as liquidated damages equal to the sum of" back pay, benefits, and prejudgment interest.

29 U.S.C. § 2617(a)(1)(A)(iii).  A court may reduce a liable employer's liquidated damages if the

employer "proves to the satisfaction of the court that the act or omission which violated [the FMLA]

was in good faith and that the employer had reasonable grounds for believing that the act or

omission" did not violate the Act.  *Id.*  Because there are genuine factual disputes material to the

City's liability under the FMLA, the court need not reach Byrd's motion for partial summary

judgment on liquidated damages.  Even if Byrd had proved the City's liability, there would also be

genuine factual disputes material to deciding whether liquidated damages are proper.

Byrd notes that "[f]or the purposes of this motion, we will assume that there is a fact issue

as to subjective good faith," but she argues that she is entitled to liquidated damages because "the

summary judgment evidence shows that the City did not have objectively reasonable grounds for believing that its conduct was lawful." (Docket Entry No. 14 at 15). Byrd argues that the summary judgment evidence establishes that the City approved her FMLA leave and then denied that leave after her return "even though nothing in the FMLA permits an employer to do this when it harms the employee." (*Id.* at 16). She asserts that the City then fired her and ignored her counsel's letter to David Cutler informing the City that it had violated the FMLA. (*Id.*). Byrd argues that these facts show that "[t]here is no objectively reasonable basis for the City's actions." (*Id.*). The City argues that it acted in good faith and, referencing its arguments related to liability, had reasonable grounds to believe that Byrd's February 2018 termination did not violate the FMLA because the City asserts that it was based on her November 2017 absences. (Docket Entry No. 16 at 10).

Because there are genuine factual disputes material to deciding liability and whether the City acted in good faith and with a reasonable belief that it was not violating the FMLA, summary judgment as to liquidated damages is inappropriate.

## IV.    Conclusion

The court denies Byrd's motion for partial summary judgment and the City's motion for summary judgment. (Docket Entry Nos. 14, 15, 16).

SIGNED on January 29, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge